# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**WAYNE STEVENSON, GAYLE STEVENSON,**
**LARRY HOLZMILLER, JUDITH HOLZMILLER,**
**RANDALL JACOBSON, MARGARET C. JACOBSON,**
**RONALD LONSCAR, JAMES L. MANTZ,**
**DIANE L. MANTZ, STAN R. MATTSON,**
**JANICE L. MATTSON, DAN SHILLINGLAW,**
**MARGARET R. SHILLINGLAW, DOUGLAS TETTING,**
**TERRENCE P. VOGL, JEAN VOGL,**
**JEFFREY J. WEIDE, MARY LINDA WEIDE,**
**ROGER WILLMS, LINDA T. WILLMS,**
**EUGENE ZIAREK, EILEEN ZIAREK,**

                    **Plaintiffs,**

        **v.**                                    **Case No. 02-C-00530**

**MILWAUKEE FORGE,**
**and MILWAUKEE FORGE HEALTH PLAN,**

                    **Defendants.**

---

## DECISION AND ORDER

---

Before setting forth its findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure, the Court briefly summarizes the activity in this case prior to the bench trial that was held. This case involves former employees of the defendant Milwaukee Forge ("the Company"), and some of those employees' spouses. The plaintiff employees accepted an early retirement plan from the Company, which included

certain alleged promises.  At the heart of the instant suit is the Company's purported promise to pay the retirees' health insurance premiums until they became eligible for Medicare.  The parties dispute the import of certain language contained in their early retirement agreements and whether the continued payment of insurance premiums by the Company was guaranteed.  The plaintiffs believe that the defendants reneged on a promise to pay their premiums for a definite period of time.  The defendants argue that they never agreed to an enforceable promise and have abided by the agreement they struck with the plaintiffs.

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over the present controversy pursuant to 28 U.S.C. § 1331 insofar as the plaintiffs' claim involves a federal question under 29 U.S.C. § 1132(a)(1)(B).  Venue is proper under 28 U.S.C. § 1391 because most of the parties reside in Wisconsin and the purported infraction of federal law occurred in the Eastern District of Wisconsin.

## II.   CASE BACKGROUND

On July 7, 2003, this Court partially granted the defendants' Motion to Dismiss and for Summary Judgment.  After the resolution of that motion, one issue remained for trial before the Court: the plaintiffs' claim pursuant to ERISA § 502(a)(1)(B), 29 U.S.C § 1132, which allows a participant in an ERISA plan to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

2

In an order dated July 7, 2003, the Court analyzed the defendants' request for summary judgment on the plaintiffs' Section 502(a)(1)(B) claim. Opposing that request, the plaintiffs argued that the early retirement agreement ("the ERIP Agreement") entered into by the parties "imbued the plaintiffs with a vested right to fully paid health insurance premiums that trumps the company's unilateral decision to require them to contribute toward the cost of the insurance." *Stevenson v. Milwaukee Forge, Inc.*, No. 02-C-530, slip op. at 11 (E.D. Wis. July 7, 2003). The defendants, the Court explained, countered that the early retirement agreement did not create a vested welfare benefit because the defendants reserved the right to modify health plans at their discretion. (*Id.*) Certain points were uncontested by the parties:

> First, the parties agree that relevant language in the Health Plan (in its several forms) reserved to Milwaukee Forge the right to cancel or modify the benefits available under the Plan. [Footnote excluded.] Second, the parties agree that there is no language in any of the relevant Health Plan documents in which the company agrees to pay for all or even a portion of the participants' premiums for health and dental insurance. Conversely, there does not appear to be any language in the Health Plan documents in which the company has affirmatively disowned any obligation to pay premiums on behalf of employees. It is also undisputed that the ERIP agreement contains an integration clause stating that its terms may only be modified by mutual written consent of the parties. The disagreement concerns the extent to which, if at all, the ERIP agreement has amended or superceded the company's ability to unilaterally modify its pledge to pay the plaintiffs' premiums until they become eligible for Medicare.

(*Id.* at 11-12.)

The plaintiffs pointed to language in the ERIP Agreements by which Milwaukee Forge agreed to "continue to pay the premiums for the group hospital, surgical, and dental

3

insurance for the retirees, their spouses and dependents until each respectively becomes eligible for Medicare." The defendants, however, noted that the very next sentence clarified that "[p]lans available, both now and in the future, will be same as those available to active employees." Thus, the defendants argued that they could require premium payments from the ERIP participants if premiums were imposed on active employees, or if the plans available to active employees allowed the Company to require such payments. The question before the Court was the relationship of the two sentences in the ERIP Agreement. Resolution of this inquiry would determine whether the defendants entered into an agreement with the plaintiffs providing vested premium payments.

The Court was guided in its analysis by the Seventh Circuit's decision in *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir. 1996). In *Diehl*, a shutdown agreement between employees and a manufacturer promised lifetime insurance as provided under an insurance agreement. The insurance agreement contained a reservation of rights clause. The Seventh Circuit found that the shutdown agreement provided vested benefits notwithstanding the reservation language of the underlying insurance agreement.

Guided by *Diehl*'s analysis, this Court found that certain language in the parties' retirement agreement was ambiguous. The Court explained that

> . . . the 'plans available' language, which immediately follows the premium payment language in the ERIP agreement, could arguably mean that the insurance benefits to which the plaintiffs were entitled were to be offered on the *same terms* as those available to active employees, including company policies regarding the payment of insurance premiums and unfettered discretion to modify any and all aspects of the benefit plan. On the other hand,

4

the phrase 'plans available' could also be read to refer solely to the *choices* available to active employees in terms of insurance options and benefit levels, excluding and apart from the promise of continued premium payments.

*Stevenson*, No. 02-C-530, at 16. The Court expressed some skepticism whether the payment of premiums could be considered a benefit available under the Milwaukee Forge Health Plan when the plan documents did not indicate any obligation on the part of the Company to pay premiums. Nevertheless, at the summary judgment stage, the Court determined that a genuine issue of material fact existed and, therefore, denied summary judgment on that particular issue. The ambiguity of language in the ERIP Agreement was sufficient to "vitiate the presumption against vesting." *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 785 (7th Cir. 2005). A bench trial was held to resolve the meaning of the phrase "plans available."

In their amended pre-trial report, the plaintiffs identified two issues for trial:

1. Whether Milwaukee Forge violated the plaintiffs' rights under the ERIP contract and ERISA plans at issue in this case by requiring the plaintiffs to pay premiums for the group hospital, surgical and dental insurance.

2. Whether Milwaukee Forge, by the separate and independent ERIP contract and agreement and General Release, guaranteed the plaintiffs [sic] right to fully paid health and dental coverage. In other words, whether Milwaukee Forge is required, by the ERIP contract and Agreement and General Release to pay the group hospital surgical and dental insurance premiums for the plaintiffs until the plaintiffs become eligible for Medicare, and is precluded from requiring the plaintiffs to pay any portion of the insurance premiums.

(Pls.' Am. Pretrial Report 3.) The defendants ask the Court to determine whether the "Plaintiffs have a vested right to continue receiving fully-paid health and dental insurance coverage . . . ." (Defs.' Pre-Trial Report 2.)

5

## III.   FACTS

### A.   Stipulated or Uncontested Facts[1]

Before setting forth its own findings of facts, as required by Rule 52 of the Federal Rules of Civil Procedure, the Court summarizes, and accepts, the following facts based on the parties' joint stipulation submitted to the Court on August 6, 2003.  (*See* Docket No. 66.)

Milwaukee Forge ("the Company"), a Wisconsin Corporation, sponsors an ERISA welfare plan called the "Milwaukee Forge Health Plan" ("the Company's Plan").  (*See* Jt. Stipulation of Facts for Trial ¶¶ 3, 4.)  Both the Company and the Milwaukee Forge Health Plan are defendants to this action.  The plaintiffs are 12 former Milwaukee Forge employees and their spouses.  (*Id.* at ¶ 5.)  The former-employee plaintiffs held salaried, non-union, management positions and retired from the Company between September and December 1999.  (*Id.*)  All of these plaintiffs retired pursuant to a one-time "Exit Incentive Program" referred to as the "Milwaukee Forge Early Retirement Incentive Plan" or "ERIP."  (*Id.*)

The Company experienced some financial difficulties beginning in early 1999.  (*Id.* at ¶ 6.)  As a result, the Company decided to reduce its number of non-union, salaried employees.  (*Id.*)  With the input of a consulting firm, Towers Perrin, the Company sought to induce employees to retire through a one-time incentive program, the ERIP.  (*Id.*)  Accordingly, on May 27, 1999, the Executive Committee of the Company's Board of

---

[1]Certain facts in this section, particularly language from documents, were derived from exhibits proffered at trial.  Insofar as this information contributes to the flow of the facts presented, the Court has cited those sources for undisputed information.

Directors ("the Executive Committee") resolved that the Company could offer special retirement benefits to a select group of qualified employees under criteria prescribed in a Towers Perrin letter dated April 19, 1999. (*Id.* at ¶ 7.) The Executive Committee authorized the continuance of insurance benefits, both dental and medical, for those retirees, their spouses and dependents, as of September 1, 1999 until the retiree reached Medicare age. (*Id.*)

At the time the ERIP was entered into, the ERIP participants were covered under the Milwaukee Forge Health Plan. (*Id.* at ¶ 8.) This larger plan consisted of three sub-plans from which employees could choose. (*Id.* at ¶ 9.) These plans included a "preferred provider" plan administered by Wausau Insurance Company ("the Wausau Plan"), an HMO administered by Family Plan Cooperative ("the Family Health Plan"), and another HMO plan administered by Compcare Health Services Insurance Corporation ("the Compcare HMO"). (*Id.*) There was also a dental plan offered through Blue Cross/Blue Shield United of Wisconsin. (*Id.* at ¶ 16.)

Typically, employees would receive Summary Plan Descriptions (SPDs) for each of the available health plans in advance of the annual enrollment period. (*Id.* at ¶ 9.) Presumably, the employees would review the SPDs, which would inform their choices about the coverage that best suited their needs. Some portions of those SPDs warrant special attention in the present litigation.

The 1999 SPD for the Wausau Plan contained a subheading entitled "Termination of Plan," which stated:

> The right is reserved for the Plan Administrator to terminate, suspend, withdraw, amend or modify the plan in whole or in part at any time, subject to the applicable provisions of the policy and the practices of the insurer.

(*Id.* at ¶ 10.) The Wausau SPD also explained that the "employer pays the entire cost for you and your dependents." (*Id.*) This same SPD, for non-union and salaried employees, further stated that "[r]etired employees are eligible for insurance by receiving retirement income as a result of former services with the plan holder." (*Id.* at ¶ 11.)

Like the Wausau Plan SPD, the Family Health Plan SPD (a.k.a. the Member Certificate of Coverage) contained a "termination" section, which provided for coverage termination "(a) if the Agreement is terminated by either Family or Group; (b) if a Member disenrolls or ceases to meet the eligibility requirements stated above; (c) if any premium is not paid when due; . . . ." (*Id.* at ¶ 13.) The Compcare Blue SPD, which Company employees received from 1997-1999, contained termination and disenrollment provisions:

> **COVERAGE TERMINATION**
> If your group cancels coverage while you are "totally disabled," your benefits will be extended until: (1) the date you ceased to be totally disabled; (2) the date you exhaust your COMPCARE benefits; (3) the date you become eligible for coverage under a similar health plan; or (4) twelve months after the date your group coverage terminated; whichever happens first. However your extension of benefits will be limited to coverage for treatment of the condition causing total disability. You are considered totally disabled if you are unable to engage in any gainful activity . . .

8

**DISENROLLMENT**
Compcare will cover you as long as you continue to be eligible and pay your premium. But Compcare can disenroll you and/or all other members of your family in the following circumstances: (1) you and/or your employer fail to pay the necessary premium to Compcare on a timely basis . . .

(*Id.* at ¶ 15.)

The SPD for the Dental Plan contained a termination provision indicating possible dates when a member's coverage would end. (*Id.* at ¶ 16.)

In June of 1999, the Company held a series of informational meetings to introduce the ERIP to prospective enrollees, specifically certain eligible non-union employees. (*Id.* at ¶ 17.) The Company President, Walter B. Dodds ("Dodds"), led these meetings. (*Id.*) At the meetings, the attending employees each received a packet of information containing a cover letter from Dodds, an Agreement and General Release Form, and a copy of their ERIP benefit computations called a "Personal Benefit Estimate" (PBE). (*Id.*; Trial Tr. 166.) The cover letter for the ERIP packet distributed to the employees, stated that, if an employee chose not to participate in the ERIP and was subsequently laid off, he would "not be offered the special benefits offered under this exit incentive program." (Defs.' Ex. 1025 at 2.) The General Release released the Company from liability for any claims that the ERIP participants might bring against it. (*Id.* at ¶ 19.)

The parties agree that the Agreement General Release and the ERIP PBEs are the documents that comprise the parties' contract. (*Id.* at ¶ 18.)

9

Out of the pool of eligible employees, fourteen employees chose to sign the Agreement and General Release and participate in the ERIP. (Jt. Stipulation of Facts for Trial ¶ 21.) Of those fourteen, twelve employees are plaintiffs in this action, along with ten of their spouses. (*Id.*) The deadline for signing the Agreement and General Release was August 13, 1999. (*Id.*) The ERIP participants' early retirement dates ranged from September 1, 1999 through January 1, 2000. (*Id.* at ¶ 22.)

The Agreement and General Release signed by the ERIP participants contained a clause stating:

> The Parties agree that this document is the entire Agreement between the EMPLOYEE and the COMPANY. Nothing said or promised by either party is part of this Agreement unless it is written in the Agreement. The Parties agree that they can change this agreement only through another written document, signed by the Parties.

(Pls.' Ex. 2 at 3.)

In late 1999 and early 2000, the Company sought to implement additional cost-cutting measures. (Jt. Stipulation of Facts for Trial ¶ 26.) One of these measures involved negotiations with a union, the Machinists and Steelworkers Union, to secure mid-term changes to the design of the Company's Plan. (*Id.*) On March 1, 2000, certain cost-saving changes to the Company's Plan became effective. (*Id.* at ¶ 27.) The Compcare HMO Plan was discontinued and the dental plan through Blue Cross/Blue Shield was replaced by a plan through Delta Dental Plan of Wisconsin, Inc. (*Id.* at ¶ 27.) Also, the Wausau Preferred Provider Plan was replaced by PPO and POS plans through Great West Insurance Company.

(*Id.*)  A stop-gap policy was available to supplement coverage for "extraordinary claims." (*Id.*)

The plaintiffs received the SPD for the Great West PPO and POS Plans in early 2000. (*Id.* at ¶ 31.)  The Great West SPD permitted the employee's employer to "[c]hange the contributions a member must pay for benefits" or change or terminate the benefits.  (*Id.* at ¶ 32.)  The SPD further explained that employee coverage would end when the employer terminated the benefits described in the SPD or on the due date of a contribution that the employee or employer failed to pay.  (*Id.* at ¶ 32.)

The Great West SPD also contained a provision explaining the plan's appeals process. It stated:

> For self-funded benefits, the Plan Administrator has the exclusive and full discretion and authority to determine the benefits and amounts payable and construe and interpret all terms and provisions of this booklet.
>
> If a Member or doctor is not satisfied with the final disposition of the claims review process, the member can initiate an appeal by giving written notice within sixty (60) days after receipt of the written claim denial.  This appeal must be filed before the Member may file a lawsuit.
>
> The Member or anyone authorized to act on the Member's behalf may appeal the claim and ask to examine any pertinent documents.  The Member should submit in writing the reasons why the claim should not have been denied, as well as any other information, questions or comments.
>
> Appeals must be submitted in writing to the Plan Administrator.
>
> The Member will be notified of the final decision within sixty days after receipt of a request for review.  Special circumstances requiring extension of further sixty days will be allowed.

11

(*Id.* at ¶ 32.)

Wayne Stevenson, Randall Jacobson, Larry Holzmiller, Gene Ziarek, Stan Mattson, Douglas Tetting, Ronald Lonscar and James Mantz, as well as their spouses, were all covered under the Wausau Plan when they retired pursuant to the ERIP.[2] (*Id.* at ¶ 23.) Daniel Shillinglaw, Roger Willms and Jeffrey J. Weide were covered under Compcare HMO and Terrence P. Vogl was enrolled in the Family Health Plan. The spouses of these employees were enrolled in the same plans as their husbands.

Effective March 1, 2000, the following ERIP participants and their spouses switched from Compcare to the new Great West POS: Daniel Shillinglaw, Roger Willms, and Jeffrey Weide. (*Id.* at ¶ 28.) At the same time, the following ERIP participants and their spouses switched from Wausau Preferred Provider Plan to the Great West POS Plan: Wayne Stevenson, Larry Holzmiller, Eugene Ziarek, Douglas Tetting, Ronald Lonscar, and James Mantz. (*Id.* at ¶ 29.) Randall and Margaret Jacobson, and Stan and Janice Mattson, effective March 1, 2000, became enrolled in the new Great West PPO Plan. (*Id.* at ¶ 30.)

Family Health Plan, the plan covering Terence and Jean Vogl, filed for bankruptcy and was replaced by an HMO offered by Compcare Health Services Insurance Corporation, effective November 1, 2000. (*Id.* at ¶ 33.) The Compcare Benefit handbook was distributed to covered Company employees in late 2000. That handbook discussed when an employee's coverage would terminate. (*Id.* at ¶ 34.)

---

[2]The stipulated facts state that both the Jacobsons and Matsons switched to the Wausau Plan from other plans just before retirement. It is not clear if that switch occurred before, or after, signing the ERIP Agreement.

More changes were on the horizon. The Company's collective bargaining agreement (CBA) with the Machinists Union was to expire on September 1, 2001, and negotiations were under way in July and August of that same year. (*Id.* at ¶ 35.) In the new agreement, the machinists agreed to certain wage concessions, and modifications to health and dental coverage. (*Id.*) Of note, the new agreement allowed the Company to offer less costly plans in place of the previous coverage available. Also, both active and retired machinists agreed to pay a portion of coverage costs. (*Id.*) These changes would become effective on November 1, 2001. (*Id.*)

On October 17, 2001, the Company notified the plaintiff employees, and other active and retired non-union employees, that their Great West POS Plan coverage would terminate on October 31, 2001. (*Id.* at ¶ 36.) Two new POS options would be available if the employee contributed a portion–a "co-payment"--of the coverage costs.[3] (*Id.*) The Company also provided notice that the Great West PPO would remain an option, but only for those already enrolled in that plan who were willing to provide monthly payments to maintain that coverage. (*Id.*) Monthly payments were also required for the two Delta Dental Care Plans. (*Id.*) Current Compcare HMO enrollees could retain their Compcare coverage, but they likewise would need to make monthly payments. (*Id.*) The October 17, 2001 notice did more than simply increase the amount of monthly payments from active non-union

---

[3]Though the term "co-payment" often refers to a minimal payment that a patient must make at the time a medical service is rendered, the term "co-payment" has been used synonymously with "premium" in the present litigation and refers to a monthly cost that must be paid to maintain insurance coverage.

employees. For the first time, retired non-union employees would need to contribute in order to maintain their Company health and dental coverages. (*Id.* at ¶ 37.) These contribution requirements became effective on November 1, 2001. (*Id.* at ¶ 38.)[4]

The ERIP participants did not think that the Company was permitted to require contributions from them. Several of them objected in writing to the Company. (*Id.* at ¶ 38.) To support their position, the ERIP participants quoted the ERIP language stating that "[t]he Company will continue to pay the premiums for the group hospital, surgical and dental insurance for the retirees, their spouse and dependents, until each respectively becomes eligible for Medicare." (*Id.*) The Company's President, Martin Essig ("Essig"), responded to the plaintiffs' letter and explained that the ERIP participants were only entitled to the same coverage plans as active employees. (*Id.*) In other words, if the active employees needed to contribute, the Company was within its contractual rights to require ERIP retiree contributions.

The plaintiffs' attorney, Paul Hoefle ("Hoefle"), wrote a letter expressing his clients' objections to the Milwaukee Forge Plan Administrator, Jill Korenkiewicz. (*Id.* at ¶ 39.) Korenkiewicz responded in a letter dated March 26, 2002. (*Id.*) Her letter stated, in part, that:

---

[4]The parties' joint stipulation of facts seems to contain an error. Joint Fact No. 36 states that the new POS coverage options, which would require payment of a premium by the retirees, would become effective November 1, 2002. Based on other information before the Court, it appears as though the correct effective date should have been listed as November 1, 2001.

14

Dramatic changes in the Company's financial condition, attributable to an industry-wide economic downturn, forced the Plan to require premium co-payments from these retirees. Although we acknowledge that Milwaukee Forge communicated its intent to continue paying the full amount of the health insurance premiums for these retirees at the time the ERIP was offered, there was never any suggestion or indication that the Company intended to permanently vest a right, in any of these retirees, to continue eligibility for health care benefits without any contribution to the cost of the premiums. To the contrary, the Summary Plan Description in force at the time that the Early Retirement Incentive Plan was offered specifically contained a provision providing:

> The right is reserved for the Plan Administrator to terminate, suspend, withdraw, amend, or modify the Plan in whole or in part at any time, subject to the applicable provisions of the policy and the practices of the insurer.

(*Id.* at ¶ 39.) The letter concluded that:

> [i]n light of the fact that Milwaukee Forge never granted the retirees a <u>vested</u> right to continuation of health benefits without contribution to the cost to the premiums, and the fact that the relevant Summary Plan Description reserves the right to modify, amend or terminate the benefits provided under the Plan, I must deny the appeal you have submitted on behalf of your clients.

(*Id.*)

Those plaintiffs who had been covered under the Great West POS Plan, now enrolled in the new Great West POS I Plan effective November 1, 2001. (*Id.* at ¶ 41.) These individuals included Daniel and Margaret Shillinglaw, Roger and Linda Willms, Jeffrey and Mary Linda Weide, and Douglas Tetting. (*Id.*) The following parties switched coverage from the Great West POS Plan to the Great West POS II Plan: Wane and Gayle Stevenson, Larry and Judith Holzmiller, Eugene and Eileen Ziarek, and Ronald Lonscar. (*Id.* at ¶ 42.) Also effective November 1, 2001, Randall and Margaret Jacobson, and Stan and Janice

15

Mattson chose to continue their coverage under the Great West PPO Plan. James and Diana Mantz did not continue their coverage under the Company's Plan.

Though the plaintiffs contest the Company's actions, they admit that the Company could have discontinued insurance coverage altogether consistent with the ERIP. (*Id.* at ¶ 40.)

B.      Rule 52 Findings of Fact by Court at Trial

The Court finds the following facts based on the proceedings at trial:

Directly below the disputed text of the Health/Dental Insurance portion of the ERIP PBEs is a section entitled "Life Insurance," one version of which reads:

> The life insurance benefits will continue as it would for an active employee for three (3) years from the date of retirement. After three years life insurance benefits convert to the standard retirement plan in effect at that time. As of September 1, 1999 the benefit for retired employees is $12,500.

(Pl.'s Ex. 1(g) at 4.)

Milwaukee Forge employees contemplating the ERIP were told that the Company would pay their health and dental premiums until they, and their spouses, reached Medicare age. (*See, e.g.*, Trial Tr. ("Tr.") 10; *see also* Tr. 163, 194 (Dodds describing intended enhancements).) No agent of the Company, when the ERIP was offered, placed any qualification on the statement found both in the ERIP PBEs and letters of clarification

16

received by the plaintiffs: The Company would continue to pay the participants' premiums until they reached Medicare age.[5] (*See, e.g.*, Tr. 41, 149.)

At one ERIP informational meeting, Dodds, after explaining the Company's financial difficulties, stated that the Company was willing to provide the potential ERIP participants with incentives to make early retirement more attractive. (Tr. 78, 83.) These incentives included increased life insurance coverage, dental benefits, waiver of any early retirement penalty, and free credited years of service when determining ERIP eligibility. (Tr. 78, 86.) The Company's offer to continue to pay premiums constituted an incentive that influenced, at least in part, the employees' decisions to accept the ERIP. (*See, e.g.*, Tr. 14, 86, 213.) At no point did the Company, through its officers or agents, describe the continued payment of premiums as "guaranteed" or "vested," (see, e.g., Tr. 47, 71-72, 117, 155), though the term "vested" did appear in the Company's labor contract documents. (*See* Tr. 244.) Nor were the employees told that the "plans available" language modified or changed the Company's agreement to pay premiums. (*See, e.g.*, Tr. 62, 68, 92.)

The plaintiffs interpreted the ERIP language to mean that the Company could change insurance carriers, or even discontinue coverage altogether. (*See, e.g.*, Tr. 27, 50, 74, 117, 118.) At least one employee, by accepting the ERIP, was willing to risk the possibility that coverage might be terminated altogether rather than face the prospect that he might retain

---

[5]The plaintiffs received letters of clarification from the company, (see Plaintiffs' Exhibits 4 & 5), reiterating the language contained in the ERIP PBEs.

insurance coverage but bear responsibility for paying premiums. (Tr. 50.) The plaintiffs believed that various provisions in the health plans could be changed by the Company, except for the continued payment of premiums. (Tr. 27, 33.) That is, the ERIP participants, including the Company's Human Resources Manager and former Company Health Plan Administrator, had no reason to doubt that the continued payment of premiums was unconditional. (Tr. 41, 88, 97.) Nevertheless, the plaintiffs understood that the Company could change premium requirements for active employees at any point. (Tr. 32.) The plaintiffs point to various letters of clarification regarding the ERIP to support their interpretation of the ERIP's language.

Two letters merit special attention. A July 21, 1999 letter from Dodds, which required employee acknowledgment in the form of a signature, clarified that spouses and dependents would be covered under the ERIP. That letter stated that "[t]he company will continue to pay the premiums for the group hospital, surgical, and dental insurance for the retirees, **their spouse and dependents** until each respectively becomes eligible for Medicare." (Pls.' Ex. 4.) That same letter also contained the ERIP language that "Plans available, both now and in the future, will be the same as those available to active employees." (*Id.*) These same representations were made in a second letter from Dodds to the employees dated August 2, 1999.

Dodds sent another letter, dated August 18, 1999, requiring certain premium payments from non-union employees, though employees who retired before January 1, 2000 were

18

exempt. Wayne Stevenson, for one, based on a conversation with Dodds, concluded that the ERIP participants were excluded from the premium payment imposition mandated in the August 18, 1999 letter because of the Company's representation in the ERIP of continued premium payments. (*See* Tr. 90.)[6]

The ERIP participants understood the "plans available" language as signifying the actual type of insurance offered or the benefits provided to existing employees. (*See, e.g.*, Tr. 44, 83.) Thus, under the ERIP participants' understanding, the "plans available" were reflected in the SPDs that they received from the Company. (*See, e.g.*, Tr. 72.)

The plaintiffs' interpretation of the phrase "plans available" conflicts somewhat with that phrase's use in the Company's CBAs. "Plans available," as used in the Company's CBAs with steelworker and machinist union employees, referred to the provisions of the plan, in their entirety, as reflected in the SPD for that particular category of union employees. (Tr. 105, 106.) All of these union plans included reservation of rights language that enabled the Company to amend, modify or terminate plans. (Tr. 108.) These CBAs contained language similar to the ERIP. For example, an insurance provision in the September 1998 steelworker CBA, stated that:

> The Company will pay the premiums for the group hospital and surgical insurance with benefits at least equivalent to the Milwaukee Forge Health Insurance Plan dated 9-1-98 or an HMO whichever is elected for any employee

---

[6]The plain terms of Dodds's August 18, 1999 letter excludes *all* non-union employees, who retired on or before January 1, 2000 from being subjected to the co-payment imposition. Thus, both ERIP participants and other non-union employees who retired prior to that date were exempt. (*See also* Tr. 371(Dodd testimony stating that Dodds's letter excluded all people in management retired before January 1, 2000).)

19

at age 62 and for the employee's spouse at the time of retirement until each respectively becomes eligible for Medicare.

(Defs.' Ex. 1092 at 69.)  It is undisputed that that the above language only provided rights for the duration of the term of the CBA.  (Tr. 112.)

The Court finds that, at the time the ERIP was offered and entered into, the Company neither foresaw nor anticipated that participants would be required to provide premium payments.  On this point, the testimony of Walter Dodds was particularly illuminating:

> Q:      And again, at the time that you were asking these people to give up their jobs and sign this release in return for the benefits that you were giving them, you had never considered that you were going to require a co-pay from them, correct?
> Dodds:  That is correct.  At this point in time, in early summer, when you take a snapshot of this, things were happening so fast that the Company did not have co-pay for anyone.  And at that point in time when this was put together, there was no thought given to co-pay one way or another.
> Q:      Just was not–not only was there no thought given to it on your part, but it was not your intention at that time to require them to pay a part of this premium, correct?
> Dodds:  Well, it wasn't–you know, you got to look back at this window of time, and at that period of time there was no intention of them having to pay co-pay.

(Tr. 167.)  This intention is evinced in Dodds's answers to potential ERIP participants' questions regarding continuation of coverage: He always stated that the Company would continue to pay the insurance premiums.  (Tr. 171, 187.)  In fact, Dodd, at the time the ERIP was offered, thought that he himself would have one-hundred percent paid insurance "forever."  (Tr. 236.)

20

Dodds's expectation that the ERIP conferred lasting benefits is reflected in his interpretation of the ERIP's language. Dodds admitted that the first sentence of the disputed PBE provision ("The Company will continue to pay . . .") dealt with premiums, whereas the second sentence ("Plans available . . .") concerned the substance of the coverage, i.e., what benefits or coverage options were available to the ERIP participants. (Tr. 177.) Dodds later modified this position and testified that the premium was a component of the plans available to active employees. (Tr. 211.) At any rate, the Court finds that both Dodds and the ERIP participants understood that the ERIP enrollees would have their premiums paid until they reached Medicare age. The Court further finds that, at the time the ERIP was entered into, the parties had not fully considered what "plans available" meant. Regardless, the parties understood that that phrase, *as used in the ERIP PBE*, did *not* include the payment of premiums.[7]

Though Dodds presented the ERIP to the potential participants, Patrick Danno ("Danno") was largely responsible for designing the package–including the ERIP portion setting forth medical benefits–and answering questions about it. (*See, e.g.*, Tr. 189, 192, 194.) Danno worked with Towers Perrin, a consulting firm, on the ERIP development. (Tr.

---

[7]Pat Danno, the Senior Vice President, Treasurer of Milwaukee Forge, and the Administrator of the Pension Plan, testified that, at the time the ERIP was offered and entered into by the participants, the Company intended to pay health insurance premiums. (Tr. 341.) Danno acknowledged, and the Court finds his testimony credible, that the ERIP offered incentives that otherwise would not have been available to the participants, such as dental insurance and early retirement. (Tr. 346-48.) Furthermore, contrary to the language in the ERIP, the retirees had no hand in its drafting. (Tr. 354.) Danno drafted the health benefits portion of the ERIP with Towers Perrin. (Tr. 358.) He also drafted the ERIP with Walter Dodds. (Tr. 339.)

21

191.)  Towers Perrin, in a letter to Dodds, dated April 19, 1999, set forth an analysis of the costs entailed in the proposed ERIP.  (*See* Defs.' Ex. 1021.)  That proposal does not specifically identify premiums as a considered cost.

The meeting minutes of the Milwaukee Forge Executive Committee at which the Towers Perrin proposal was authorized state that:

> the Executive Committee authorizes continuance of the health/dental care benefits for these retirees, their spouse and dependents as of September 1, 1999 until the age of Medicare.  Plans available, both now and in the future, will be the same as those available to active employees.

(Defs.' Ex. 1022.)  The ERIP participants never received a copy of the Executive Committee's resolution, which Danno drafted.  (Tr. 338, 340.)  This resolution, like the Towers Perrin cost analysis, was silent on the issue of premium payment and did not use the term "vested" to describe those rights.  (*See* Tr. 330.)  The Executive Committee did not discuss the vesting of premium payments and neither the Company, nor Dodds, nor the Executive Committee considered the cost of premiums in its ERIP calculations.  (Tr. 322-23.)

The Company had never before guaranteed health benefits and the Executive Committee did not suggest that this step should now be taken for the first time.  (Tr. 196.)  The Company, at the time of the ERIP, was seeking mid-term concessions from the Company's two unions in order to stem financial losses and, the granting of vested benefits to the ERIP participants would have greatly weakened the Company's ability to negotiate mid-term concessions with the unions.  (Tr. 198; *see also* Tr. 333.)  The August 18, 1999

22

letter imposing co-payments on certain non-union employees was part of the Company's union-negotiating strategy, though the ERIP participants did not know this. (Tr. 240-41.)

A letter, dated March 26, 2002, (see Plaintiffs' Exhibit No. 23), and sent from Jill Korenkiewicz to plaintiffs' counsel, states that the SPD in effect at the time of the ERIP offering contained a right-to-modify clause. At trial, it was clarified that only the Wausau Plan, at the time of the ERIP offering, contained that provision. (Tr. 274.) Neither the Compcare Plan nor the Family Health Plan provided that those coverages could be modified or amended, though both plan SPDs contained termination clauses. (Tr. 278, 281, 283.) The SPD for the Company's dental benefits likewise contained only a termination section. (*See* Defs.' Ex. 1019 at 24.) Issued in March of 2000, the SPD for the Great West Plan contained a section stating that the employer could change the contributions from members. (Defs.' Ex. 1090 at 5.)

Korenkiewicz testified that the Company's health plans comprised both the SPDs distributed to the employees and the Company's contracts with the carriers. (Tr. 280.) The contract between Family Health Plan Cooperative and the Company, (see Defendants' Exhibit No. 1015), contained a clause that allowed the Company to amend the contract. (*See also* Tr. 281.) The Compcare Health Services contract with the Company also contained a provision allowing the Company to modify the contract, pursuant to certain procedures, and was in effect when the ERIP was offered. (*See also* Tr. 282-83.) Korenkiewicz testified that it was these provisions that she had in mind when she wrote the March 26, 2002 denial of

23

appeal letter. (Tr. 281, 283.) (She claimed that she understood the Family Health Plan's termination provision to also allow amendment. (*See* Tr. 282.)) The Court finds Korenkiewicz's testimony on this point less than convincing. As explained later in this opinion, the provisions identified by Korenkiewicz in the carrier master contracts did not allow the Company to impose premiums.

Korenkiewicz worked with Danno on the ERIP PBEs. The payment premium language in the PBEs was taken from the Company's CBAs, which, though using the same language as that found in the ERIP PBEs, was not intended to confer a vested right. (*See* Tr. 289; Defs.' Ex. 1092 at 69.) In the CBAs, the phrase "plans available" correlated to the SPDs:

> Q:     And what plans was the Company referring to here when it said plans available to active employees? What documents were they talking about?
>
> Korenkiewicz: They would have been talking about the Summary Plan Descriptions that were available to them.

(Tr. 291.)  Korenkiewicz testified that the purpose of the first sentence in the Health Insurance/Dental Insurance section of the ERIP PBE was simply to let the participants know that they would be eligible for continuation of paid health insurance. (Tr. 291.) After all, Korenkiewicz explained, not all ERIP retirees would have been eligible for paid insurance based on their years of service and age. (Tr. 291.) In other words, the ERIP participants "were going to be treated as if they had the 30 years of service, reached the age of 55 requirement, for fully paid–for continuation of health care premiums to be paid as if they

24

retired under those conditions." (Tr. 293.) Korenkiewicz testified that the only vested rights for Company employees are found in the Company's pension plans and, with regard to the ERIP, there was no intention to create a vested right. (Tr. 295.) Miller also testified that vesting was only found in the Company's pension. (Tr. 330.)

Though two employees requested changes to other aspects of the ERIP PBE language before accepting it, no employee asked for modification of the language to reflect a vested right to health care premium coverage. (*See* Tr. 303; Defs.' Exs. 1070(a) & 1034(a).)

One employee, James Mantz, refused to pay the co-payment when required by the Company. As a result, his health care coverage was terminated. (Defs.' Ex. 1096; Tr. 304.) All the other ERIP participants re-enrolled and have paid the premiums required by the Company. (Tr. 305.)

The Company claims that the co-payment was simply one component of the benefits offered under the health plans. (Tr. 382.) (Although, payment of premiums is not listed as a benefit under Exhibit 1009, which is a table comparing benefits among the various plans offered to employees.) Danno stated that the ERIP "sets the eligibility parameters" while the plan documents "set the term." (Tr. 353.) Danno, when asked about the plaintiffs' interpretation that the "plans available" language in the ERIP only referred to the benefits, explained that benefits were only a portion of the plan. (Tr. 374.) The plan included other elements such as a provision regarding ERISA rights and the grievance file procedure, which were an important part of "the plan." (Tr. 374.) These elements would be excised if "plans

25

available" referred only to benefits. (Tr. 374.) In fact, the plaintiffs' appeal to the Plan Administrator suggested that they understood the "plans available" language as referring to something beyond only the benefits portion of the plans. (Tr. 375.) The Court finds that the Defendants' Exhibit 1009–a chart laying out a comparison of various plans' benefits further shows that "plans available" could not be interpreted to mean "benefits." (*See* Tr. 374.)

## IV. STANDARD OF REVIEW

The Court first addresses the standard of review that governs this case. In their post-trial brief, the defendants argue that the Court should apply a deferential standard of review based on the plan administrator's resolution of the question the plaintiffs now bring before the Court. (Defs.' Post-Trial Br. 10.) If correct, this proposition likely would have obviated the need for a trial to ascertain the meaning of ambiguous terms in the ERIP contract. The plaintiffs argue that the Court's determination of the question before it should be *de novo*.

Jill Korenkiewicz, in a letter dated March 26, 2002, denied an appeal, by the plaintiffs, of the Milwaukee Forge Health Plan's decision to require retiree contributions towards the payment of health insurance premiums as a condition of eligibility. This decision, the defendants argue, settled the issue and cannot be reviewed *de novo* by this Court. The defendants state that, "The Great West and Compcare Plans . . . were the only health plans covering the Plaintiffs when the premium co-payment requirement was imposed, and are thus the plans that the court must examine to determining [sic] the appropriate standard of review

26

to utilize in this case." (Defs.' Post-Trial Br. 11.) The defendants cite to the Great West SPD to bolster their position:

> The Plan Administrator has complete authority to control and manage the plan. The Plan Administrator has full discretion to determine eligibility, to interpret the plan, and to determine whether a claim should be paid or denied, according to the provisions of the plan as set forth in this booklet.
> . . .
> For self-funded benefits, the Plan Administrator has the exclusive and full discretion and authority to determine the benefits and amounts payable and to construe and interpret all terms and provisions of this booklet.

(Defs.' Post-Trial Br. 12 (citing Defs.' Ex. 1090 at 31).)

A careful reading of the above excerpts reveals that the Plan Administrator has complete authority to interpret the plan according to the provisions of the plan as set forth in the plan *booklet*. Nevertheless, the defendants argue that "[b]ecause the Plan Administrator's discretion is 'completely unrestrained' by the language of the relevant plans, her conclusion, made with due deference to the ERIP Agreement, that Milwaukee Forge had the authority to require contributions from Plaintiffs as a requirement of their continued eligibility to participate in the Plan, must be reviewed under the 'arbitrary and capricious' standard." (Defs.' Post-Trial Br. 13.) The defendants cite two cases in this circuit concerning a plan administrator's ability to consider extrinsic evidence when rendering a benefits determination. Neither of these cases supports the defendants' contention that this Court's review must be deferential.

In *Krawczyk v. Harnischfeger Corporation*, the plaintiffs appealed a district court's grant of summary judgment. 41 F.3d 276, 277 (7th Cir. 1994). The plaintiffs argued that

27

they should have been permitted to include a lump-sum severance payment as compensation when calculating their pension benefits. That case, however, is readily distinguishable from the one before this Court. In *Krawczyk*, extrinsic evidence was considered to ascertain the meaning of an ambiguous term in a retirement plan. In the present instance, the Plan Administrator did not interpret the meaning of the underlying insurance plan. Rather, she interpreted the ERIP Agreement, though the documents comprising that agreement do not confer such authority on her.

In *Swaback v. American Information Technologies Corporation*, an employee's widow sought to reverse a district court's grant of summary judgment finding that the deceased employee had failed to provide the proper notice that would have entitled him to receive a lump sum pension payment. 103 F.3d 535 (7th Cir. 1996). The resolution of that ERISA case focused on the interpretation of a pension plan. *Swaback*, 103 F.3d at 539. The only premise in that case that the Defendants cite is the proposition that courts will defer to plan administrator's interpretations of ERISA plans made pursuant to common law principles of contract interpretation. Neither *Swaback* or *Krawczyk*, however, stands for the proposition that a district court must accept a plan administrator's interpretation of an independent contract–one entered into separately from any benefit plan–which does not confer interpretational authority on a plan administrator. This does *not* mean that the Plan Administrator is precluded from using the ERIP to interpret ambiguous insurance plan terms.

28

The defendants, however, cannot disregard these distinctions and claim that the Plan Administrator's interpretation of the ERIP should be given deference.

## V.    CONTRACT INTERPRETATION

Because the plaintiffs' action is brought pursuant to ERISA, this Court applies federal common law principles of contract interpretation. *Swaback*, 103 F.3d at 540 (citing *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864-65 (7th Cir. 1995)). Employing this approach, the Court must read the ERIP Agreement as a whole, giving effect to its various parts and related documents. *Bland v. Fiatallis North Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). The parties dispute whether the ERIP confers vested rights to paid premiums. Once vested, rights become forever unalterable. *Bland*, 401 F.3d at 784. Because there is no legal requirement to vest benefits, the Company's intent to vest must be evidenced by "clear and express language." *See Inter-Modal Rail Employees Ass'n*, 520 U.S. at 515. Documents, however, do not need to use the word "vest" or some type of unequivocal statement that vested rights are being conferred. *Bidlack v. Wheelabrator Corp.*, 993 F.2d, 603 607 (7th Cir. 1993). There is an "exploding presumption" against vesting if the relevant documents are silent regarding the vesting of welfare benefits. *Vallone* v. *CNA Fin. Corp.*, 375 F.3d 623, 632 (7th Cir. 2004). This presumption is overcome by "any positive indication of ambiguity, something to make you scratch your head." *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 544 (7th Cir. 2000).

29

A.    Vesting Language

A question of law is debated by the parties in their post-trial briefings and merits discussion as a preliminary matter. Apart from any facts adduced at trial, the defendants argue that the ERIP's language cannot vest rights, as a matter of law. The defendants argue that "[n]umerous courts have confirmed that an employer's commitment to 'continue' certain welfare benefits does not reflect an intent to vest those benefits." (Defs.' 03/23/04 Post-Trial Br. 27.) The plaintiffs' central counter-argument is that the ERIP's durational language–"until each becomes eligible for Medicare"–differentiates this case from those where an agreement simply states that a particular benefit "would continue." (Pls.' 03/30/2004 Post-Trial Br. 15.) The plaintiffs have the better argument on this point.

The ERIP contract does not simply state that the Company "will continue" premium payments. The contract states that these payments will continue for a defined period–until the participants become Medicare eligible. Many cases concern situations where a party questions whether a particular benefit or right survives the expiration of a contract. *See Bialoszynski v. Milwaukee Forge*, 419 F. Supp. 2d 1045, 1051 (E.D. Wis. 2006) ("If a CBA or other governing document provides for health-care benefits for retirees, but is silent on the issue of whether or not those benefits exceed the life of the agreement, then the presumption is that the benefits expire with the agreement."). Accordingly, courts have often inquired into the durational component of a stated benefit. (*See Int'l Union v. Skinner Engine Co.*, 188 F.3d 130, 141 (3d Cir. 1999) ("It cannot be said that the phrases clearly and expressly

indicate vesting since there is simply no durational language to qualify these phrases."). In the present circumstances, the ERIP contract itself does not have a definitive expiration date. The insurance provision in dispute does, however, contain a definitive period of applicability, until the retirees and their spouses reach Medicare eligibility. At a minimum, there is some ambiguity regarding how the duration of that provision interacts with the following sentence addressing "plans available." Where durational language is *not* coupled with any right to modify conferred benefits, the parties to an agreement may have intended to establish vested rights.[8]

The language contained in the ERIP does not, as a matter of law, preclude a claim of vesting.

B.    Plans Available

In the instant case, a trial was held to ascertain the meaning of the phrase "plans available" in the ERIP, and how narrowly or broadly that phrase should be understood. The parties have offered different interpretations of the meaning of the term "plans" in the ERIP. The Court begins by analyzing the meaning of that term at the time that the parties entered into the ERIP. While various health insurances might be offered to the ERIP participants, the meaning of the phrase "plans available" in the ERIP contract itself is not variable.

---

[8]Accordingly, a trial was held to disambiguate the phrase "plans available" to determine if that phrase suggested a right to modify on the part of the defendants. As reflected in its prior summary judgment motion, the Court finds little reason to doubt that the first sentence of the ERIP PBE's Health Insurance/Dental Insurance provision ("The company will continue to pay . . ."), standing alone, would confer a vested right to payments of premium costs.

31

At trial, the plaintiffs forwarded the possibility that "plans available" referred solely to benefits. The exact contours of this argument are hazy at best. For one thing, if "plan" and "benefit" conveyed the same meaning, it would be difficult to explain the ERIP's use of the word "benefit" in the PBEs' "Life Insurance" section directly under the Health Insurance/Dental Insurance paragraph.[9] The wording of certain of the "Life Insurance" sections suggests that benefits, of whatever type, are dictated by a larger plan. ("After three years life insurance benefits convert to the standard retirement plan in effect at the time.") The plaintiffs also point to the testimony of Walter Dodd stating that "plans available" dealt with "the substance of the coverage" available.[10] (*See* Pls.' 03/06/04 Post-Trial Br. 9-10.) Even this statement, however, is less than illuminating. As Danno pointed out at trial, surely "plans" (or "plans available") did not exclude mechanisms such grievance file procedures. (*See* Tr. 374.) The Court finds that, as used in the ERIP contract, the terms "benefits" and "plans available" do not mean the same thing.[11]

---

[9]The wording of the Life Insurance sections shows some variation among the retirees' PBEs.

[10]Dodds's testimony on this point bears some similarity to the plaintiffs' testimony that "plans available" referred to the "type of insurance" offered.

[11]Putting aside the question of what, substantively, comprised the "plan" or "plans available," there was conflicting, or at least somewhat confusing, testimony regarding which documents composed the plan. The employees only received SPDs when making their coverage choices. And, the employees thus understood that the "plans available" were reflected in the SPDs they received. (*See* Tr. 72.) Yet, Korenkiewicz testified that the "plans available" comprised both the SPD and the master contract between the carrier and the Company. (*See* Tr. 280.) But, the CBAs' use of the phrase "plans available"–which the defendants made a point of stating did *not* confer vested rights–were reflected only in the union members' SPDs. Though it is not necessary to resolve this particular issue, the Court notes that it would be strange for the Company to claim that its master contracts (with the insurance carriers) were part of the "plans available," when those contracts were not in contemplation of the parties when they entered into the ERIP.

The Court reiterates its prior finding that premiums are not properly considered benefits. The defendants' Exhibit 1016, the Family Health Plan SPD, clearly distinguishes between "premiums" and "benefits." (*See* Defs.' Ex. 1016 at 5 (defining "premium" as "[t]he monthly fees charged by Family to Subscribers for the provision of Benefits for Covered Health Services under this Certificate.").) This distinction is further evidenced by the "Schedule of Benefits," identified as "Attachment A" to that Exhibit, which does not discuss premiums. The Compcare SPD (Defs.' Ex. 1018) also seems to implicitly differentiate benefits from premiums. The very first sentence of that SPD reads "COMPCARE is designed to provide benefits to you when you are healthy as well as sick." (Defs.' Ex. 1018 at 1.) Benefits are clearly something that Compcare provides. Premiums, by contrast, are *received by* Compcare. At any rate, the Compcare SPD does not discuss who pays premiums. The Compcare SPD also discusses "plans that coordinate benefits" on page 32, stating that "[t]his Plan coordinates its benefits with any arrangement that provides care or benefits for medical or dental treatment." (Defs.' Ex. 1018 at 32.) In its July 1, 2003 decision, the Court previously explained that "the payment of premiums was not, strictly speaking, a benefit available under the Health Plan, because the plan documents are silent as to any obligation of the company to pay premiums and conversely any disavowal of an obligation to pay premiums." *Stevenson*, No. 02-C-530, at 16. Based on the evidence adduced at trial, the Court is satisfied that "plan" is not synonymous with "benefit," though "benefits" seem to be one component of any given "plan."

33

The Court also finds that whatever "plans available" meant at the time the ERIP was offered, that phrase did not necessarily include any reservation of rights to modify by the defendants. Contrary to the defendants' suggestion that the Court should focus on the SPDs in place when the premium requirement was initiated or imposed, the Court first looks to the plans in place when the ERIP was offered and entered into, or when the participants retired. This methodology casts a doubtful light on some of the testimony of Korenkiewicz and any claim that, at the time the ERIP was offered, the Company possessed the ability to modify the responsibility for premium payments.

The Family Health Service Agreement between Family Health and the Company, (see Tr. 280-81; Def. Ex. 1015, at 35), stated that:

> 19.01 <u>Amendments</u>. By this Agreement, Group makes Coverage available to persons who are eligible under Article 4. However, this Agreement shall be subject to amendment, modification, or termination in accordance with any provisions hereof or by mutual agreement between Family and Group without the consent or concurrence of the Members. By electing medical and Hospital Coverage pursuant to this agreement, or accepting Benefits hereunder, all Members legally capable of contracting, and the legal representatives of all Members incapable of contracting, agree to all terms, conditions and provisions hereof.

(Defs.' Ex. 1015 at 35.) That contract, however, is between the Company and Family Health. Furthermore, that service agreement does not state who pays the required premiums.

At the time of the ERIP, the Family Health Plan SPD (see Defs.' Ex. 1016) only contained a right-to-terminate provision. (Defs.' Ex. 1016 at 16; Jt. Stipulation of Facts for Trial ¶ 13.) Yet, Korenkiewicz testified that she understood that this termination section

34

meant that the Company could not only terminate coverage, but also modify it. (*See* Tr. 281-82.) That section of the Family Health Plan Certificate of Coverage *only* discusses reasons for termination, not modification.

Putting aside the Wausau Plan in effect when the plaintiffs signed the ERIP agreement, the Court doubts the defendants' claim that they retained the right to modify the ERIP contract by exercising modification provisions in subsequent insurance offerings. The Company points to Exhibit 1017, the contract between Compcare and the Company in effect when the ERIP participants retired, to show that the Company had the right to modify premiums. (*See* Tr. 283.) Page 48 of Exhibit 1017 states that:

> If the Group or Compcare desire to amend this Contract, it shall give written notice to the other party at least sixty (60) days prior to the last day of any calendar month setting forth the proposed amendments. If the party receiving such notice agrees in writing to such amendments, they shall be effective as of such last day. If the party receiving such notice does not agree in writing to such amendments within said sixty (60) days after receipt thereof, this Contract shall terminate at the end of such last day.

(Defs.' Ex. 1017 at 48.) The language found on that page of the contract, shows that "the Group" is distinct from "the employees." ("On or before the due date mutually agreed upon between the Group and Compcare, the Group shall furnish a report to Compcare showing the employees of the Group and their Dependents . . . .") In other words, Exhibit 1017 is a contract between the Company and Compcare; the Company may have reserved the right to change *this agreement with Compcare*. However, the ERIP retirees were not a party to this

35

contract, and, as far as the Court knows, never even received this master contract. The Company's reliance on any amendment provision contained therein is misplaced.

Defendants' Exhibit 1018, the Compcare Benefit Handbook, does not contain a right-to-modify clause either. It only contains a right-to-terminate provision. (*See* Defs.' Ex. 1018 at 29.) Korenkiewicz said that this was the provision she was referring to in her March 26th denial letter. The Court is not buying this argument. A right to terminate does not imply a right to modify. That is an unsubstantiated leap. Admittedly, the Compcare Handbook admonishes employees to "[r]emember that benefits described are subject to the terms and conditions of the master contract issued to your employer group." (Defs.' Ex. 1018 at 1.) However, as explained above, the modification provision in the master contract does not implicate the amendment of the provisions of the Handbook, but rather the master contract itself. The same problem exists with the Company's invocation of a termination section in the Blue Cross/Blue Shield Dental Plan in effect when the ERIP participants retired. (*See* Tr. 284; Defs.' Ex. 1019, at 24.)

Turning to the coverage in effect when the Company began requiring retiree premium payments, the parties do not dispute that the terms of the Great West SPD, covering the Great West PPO and POS Plans, issued in early 2000, allowed the Company to impose premium payments on the ERIP enrollees. (*See* Defs.' Ex. 1090 at 5.) By contrast, the Compcare HMO SPD–that is the SPD for the insurance replacing former Family Health Plan enrollees–only contained a provision explaining when Compcare's coverage would

36

terminate. (*See* Jt. Stipulation of Facts ¶ 34.) These were the SPDs and insurance coverages in place when Essig's October 17, 2001 letter issued. (*See* Defs.' Ex. 1081.) Though the changes in Essig's letter pointed to the introduction of two new POS plans, and the termination of the then-current Great West POS Plan, the parties did not proffer at trial any new SPDs related to the new POS plans.

Several questions loom. First, it is less than clear how the Compcare and Family Health Plans in effect at the time of the ERIP offering permitted the Company to impose premium payments. Second, the Court does not understand how the Compcare SPD (in place when the Company indicated that it would require premium requirements from the retirees) permitted the Company to impose a premium payment. Third, it is unclear precisely under which SPDs the premiums were imposed. Were new SPDs issued in accord with the changes in October 2001? Or, were the previously issued SPDs maintained? The parties focus on the SPDs in effect before the new coverage effective date of November 1, 2001. Though these questions linger, the Court, borrowing from the representations of the parties, understands that the parties do not dispute that, at the time the premium payment was imposed, the Company, putting aside the applicability of the ERIP temporarily, was permitted to take such actions. The Court now resumes its analysis of the meaning of the "plans available" language.

The defendants are essentially arguing that the ERIP contract contained the potential for insurance modification–including the imposition of premium payments on retirees– as

new insurance plans were "plugged" into the PBEs' structure. Arguably, this was anticipated by the phrase "plans available, *both now and in the future* . . . ." (emphasis added). Before the Court, however, the defendants make the representation that they would have, for various reasons, not surrendered the right to impose premium payments on the retirees. But only the Wausau Plan, of the plans in effect when the plaintiffs entered into the ERIP, contained a clear right to modify provision. (That provision allowed the administrator to modify the "plan."[12] And, Defendants' Exhibit 1013, the Wausau SPD, states that "Your employer pays the entire cost for you and your dependents." (Defs.' Ex. 1013 at 1.)[13]) How can the defendants argue that they would not have surrendered the right to impose premium payments when that ability did not even exist under certain of the plans in place when the ERIP was offered?

To summarize, when the ERIP was signed, the ERIP participants were enrolled for health insurance that can be divided into two groups. One group was covered under plans

_____

[12]Defendants' Exhibit 1013, the Wausau SPD, in its "Definitions" Section, states: "'Plan' and 'Plan Holder' mean policy and policyholder, respectively." (Defs.' Ex. 1013 at 12.) Even this distinction, however, is somewhat confusing in light of the SPD's earlier statement that "[t]he right is reserved for the plan administrator to terminate, suspend, withdraw, amend, or modify the plan in whole or in part at any time, subject to the applicable provisions of the policy and the practices of the insurer." (Defs.' Ex. 1013 at 1.) This quote does not seem, contrary to the former definitions, to use "plan" and "policy" interchangeably.

[13]The Wausau SPD in effect when the plaintiffs entered into the ERIP, states that "[t]he right is reserved for the plan administrator to terminate, suspend, withdraw, amend, or modify the plan in whole or in part at any time, subject to the applicable provision of the policy and the practices of the insurer." (Defs.' Ex. 1013 at 1.) Though this sentence seems to differentiate "plan" from "policy," the Definitions portion of the SPD defines "plan" and "plan holder" to mean policy and policyholder, respectively. (*Id.* at 12.) Insofar as the SPD explicitly references the policy, submitted as Defendants' Trial Exhibit 1002, the Court now turns to that document.

The Wausau Policy identifies the policyholder as "Milwaukee Forge." (*See* Defs.' Ex. 1002, 2nd page.) On page one, as identified in that document, the plan holder is identified as the payor of 100% of employee and dependent premiums. Thus, the issue of premium payment is identified in the policy, which, by the plain terms of the Wausau SPD, is identified as the "plan." And, the SPD explicitly allows the plan administrator to modify the plan or policy.

38

that did *not* provide for modification by the Company. The documents of the Wausau Plan, however, explicitly allowed the Company to make changes to the plan and the arrangement for payment of premiums. But, the defendants do not argue that the ERIP should have meant something different to those plaintiffs covered under the Wausau Plan when they entered into the ERIP. The defendants, instead, seem to rely on the insurance plans, in place, at the time that the premium co-payment was imposed and the modification provisions in those plans made applicable–according to the defendants–through the "plans available" language in the ERIP. In other words, the available plans could override the promise to pay the ERIP participants' premiums.

Against this backdrop, the Court folds in the information gleaned from trial. In their post-trial brief, the defendants acknowledge that

> At the time the ERIP was offered, Milwaukee Forge did intend and expect that health and dental coverage would continue to be provided to the ERIP participants, until Medicare eligibility, on the same basis as those coverages were provided to active employees, which, ***at that time***, involved Company payment of the full amount of the premiums. Defendants admit they had no specific plan or intent to change the allocation of the cost burden for those benefits when the ERIP was offered. However, an employer's act of communicating its commitment to provide welfare benefits to plan participants does not create a vested right to those benefits, even though the employer does not have a specific plan or intent to change those benefits at the time they are offered.

Defs.' Post-Trial Br. 20.) Both parties understood that the Company would continue to pay the retirees' premiums until they reached Medicare eligibility. Much of the evidence at trial

simply reiterated what the plain wording of the ERIP suggested, i.e., that the Company would pay premiums until the retirees reached Medicare eligibility.

Generally, the information adduced at trial spoke tangentially to the meaning of the phrase "plans available," by introducing testimony and evidence pertaining to the substance of the parties' agreement and why one interpretation should be favored over the other. The Court finds credible the plaintiffs' statements that the promise of premium payments was an added incentive for accepting the ERIP. The Company's explanations, at trial, for why it would not have provided vested benefits are less convincing. In fact, these explanations seem more akin to *post hoc* rationalizations. For example, the Court draws few inferences from the fact that the Executive Committee and Danno did not consider the costs of continued premiums. (The Company suggests that the absence of such computations shows that it never contemplated vested premium payments.) The absence of any cost calculations related to premiums appears more in the nature of an oversight than any indication that the Company did not intend to vest welfare benefits. After all, the plain wording of the ERIP contract contemplated some type of continued payment of premiums; the costs would have been relevant whether the premium payments were vested or not.

Similarly, the defendants offered testimony showing that the ERIP language was borrowed from CBA language, which did not confer vested rights. While this may be true, the presence of similar, or even identical, language carries little weight. The CBAs were for a determinate period of years, and there is a legal presumption that the benefits conferred

40

therein would not outlive the duration of the agreement. The ERIP, unlike the CBAs, provided additional incentives to induce the prospective participants to retire. Put another way, the ERIP was offering something different than the usual offerings made to employees or union members. And, the ERIP contract was not of a limited duration.

The Court finds the testimony of the defendants less than forthright and internally inconsistent. Dodds, though later attempting to modify his position, testified that the first and second sentences of the ERIP's Health and Dental Insurance provision spoke to different elements of the insurance coverage. That is, Dodds's original testimony suggested that the phrase "plans available," as used in the ERIP PBEs, did not contemplate payment of premiums. (*See, e.g.*, Tr. 177.) Furthermore, the Court finds little if any support for Danno's contention that the premium payment obligation was a component of the benefits under the offered health plans. (*See* Tr. 382.) The Court has already noted Korenkiewicz's acknowledgment that her March 26, 2002 letter was not entirely accurate insofar as only the Wausau Plan in effect at the time of the ERIP offering contained a right-to-modify clause. Based on the testimony of the defendants' representatives at trial, it does not appear that the defendants themselves have (or had) a clear idea of the meaning of the phrase "plans

41

available" as used in the ERIP PBEs.[14]  The defendants have done little to disambiguate that phrase.

Both parties' trial presentations have, to understate the matter, not thoroughly illuminated the possible meanings of the phrase "plans available."  This much is certain: The Company said it would pay the retirees' benefits.  And those payments would continue until the employees reached Medicare eligibility.  This commitment was part of an incentive-laden agreement that attracted the employees' participation.  While the Company's agents did not use words like "guaranteed" or "vested," the ERIP participants reasonably understood that the ERIP provided for premium payments until they and their spouses became Medicare eligible.

Evidence of the defendants' intent to vest the plaintiffs' premium payments may be found in Dodds's July 21, 1999 and August 2, 1999 letters.  The information being relayed via these letters is not subject to any presumption that accrues to a formal agreement or effort of interpretation.  In other words, the Court need not undertake any of the interpretive gymnastics that the common law requires when reading a formal ERISA plan.  A plain, common sense reading of these letters indicates that the Company will pay premiums until the retirees become Medicare eligible and the retirees will be able to pick from those

---

[14]The Court also finds suspect the trial testimony of Essig.  At his deposition, Essig stated that he did not think that the Company could have imposed a co-payment on the ERIP participants on the day after they entered into the ERIP. At trial, however, Essig stated that his prior testimony simply meant that such an immediate imposition of a co-payment would have been impractical.  The Court does not know what, exactly, this means.  The Court suspects that Essig's deposition testimony reveals his thoughts more accurately, i.e., the ERIP contract precluded the Company from exacting premium payments from the ERIP participants.

coverages available to active employees. Even if the defendants argue that these letters contain the same ambiguity as the ERIP PBEs and the letters' language was borrowed from the ERIP contract, the Court finds that a reasonable person would have understood these letters as promising premium payments. These letters of clarification, though drafted to clarify other points, indicated the Company's intent to assume continued premium payments as part of the ERIP contract.

Putting aside the defendants' questionable positions on the phrase "plans available," and the common sense understanding of the representations they made to the plaintiffs, the Court finds that the parties' objective intent finds expression in an interpretation of "plans available" meaning the full panoply of coverage rights that accrued to active employees minus the ability of the Company to impose premium costs on the ERIP participants. This understanding is consistent with the language of the ERIP contract. Even if the objective evidence adduced at trial did nothing to dispel the PBEs' ambiguity, the Court would arrive at the same conclusion through the application of the rule that ambiguities are construed against a contract's drafter. *See Baker v. Am.'s Mortgage Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995). The application of this rule would lead to an understanding of "plans available" that did *not* include any rights to modify–at least with respect to premium payments–by the Company.

The defendants may object that a vesting of benefits is precluded by (1) the existence of a right-to-modify provision in the Wausau Plan when the ERIP was entered into; and (2)

43

the Company's right to exercise modification provisions in subsequent plans, which were contemplated as "plans available now and in the future." As to the first issue, two bodies of case law stand in some tension on this issue. On one side, the case law explicitly states that the inclusion of a reservation of rights to alter trumps a claim of vesting. *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995) ("If a contract provides that benefits can be terminated, then those benefits do not vest); *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.*, 58 F.3d 896, 904 (3d Cir. 1995). This position flows from the requirement to interpret contracts in a way that provisions are not contradictory. The Court, following the *Murphy/ Unisys* line of cases, could find that, because "plans available" includes provisions to modify, the Company did not provide a vested right by stating it would pay premiums for a definite duration.

On the other hand, *Diehl* suggests that, even if an incorporated plan contains a reservation of rights, that right may be superseded by subsequent contracting. The ERIP agreement, like the agreement in *Diehl*, was "an independent contract, supported by separate consideration and capable of modifying or supplanting prior contractual arrangements." *Diehl*, 102 F.3d at 306-07. Thus, even if the plans in effect at the time of the ERIP offering contained right-to-modify provisions, the ERIP contract would take precedent over the Company's right to exercise those powers in a manner contrary to the parties' agreement.

The defendants disagree and argue that the *Diehl* case contains a "critical distinction":

> In <u>Diehl</u>, the shutdown agreement provided that the retired employees "shall, ***not withstanding any provision of the insurance agreement*** . . . be entitled

44

> for the lifetime of the pensioner . . . to the life insurance and hospitalization, medical and surgical expense benefit coverages as provided under . . . the insurance agreement." <u>Diehl</u>, supra at p. 306. In contrast to the Shutdown Agreement in <u>Diehl</u>, the ERIP Agreement in this case specifically provided that participants would be eligible to participate in the ***very same plans*** available to active employees, which Plaintiffs understood to include Reservation of Rights clauses.

(Defs.' 03/23/04 Post-Tr. Br. 32.) However, the Court previously explained that "the 'notwithstanding' language did not play a significant role in the *Diehl* Court's analysis." (Decision and Order, July 7, 2003 at 14.) Furthermore, this Court's decision mirrors the *Diehl* Court's conclusion that

> we see no reason why the "change or discontinue" language in the insurance booklets should take precedence over the Shutdown Agreement's clear provision for lifetime benefits. To the contrary, the promise of lifetime benefits abrogated whatever right Twin Disc may have had to terminate coverage.

*Diehl*, 102 F.3d at 307. Based on the evidence adduced at trial and the language of the ERIP contract, the Court understands that both parties intended the ERIP to override any pre-existing right by the company to impose premium payments on the ERIP participants. Thus, even if the Wausau Plan in effect when the ERIP was offered permitted the Company to require premium payments from employees, the ERIP agreement overrode that provision.

The effect of the ERIP is fairly narrow. The ERIP has not eviscerated the Company's modification powers under the various plans it offers. Rather, the ERIP has established a separate contract, between the ERIP participants and the Company, by which the Company cannot use those powers of modification to impose premium payments on the ERIP

45

participants without running afoul of ERISA requirements. The ERIP contract explicitly states that "[t]he Parties agree that they can change this agreement only through another written document, signed by the parties." Unless the defendants can produce a document in which the plaintiffs agreed to accept responsibility for premium payments, the defendants' efforts to impose those costs contravene the ERIP contract.

For these same reason, the defendants' attempts to impose premium payments under the plans in effect in 2001 likewise lose steam. The Court finds that the defendants' focus on those plans is misplaced. If the ERIP contract overrode the Company's right to exact premium payments from the ERIP retirees when the ERIP was offered, there is no basis for thinking that a right-to-modify provision in a later-offered plan now takes precedent. Of course, this very question lies at the heart of this action and the Court, for the foregoing reasons, has found that the plaintiffs' rights do not vary based on the underlying insurance coverages offered by the Company.

The Court finds that neither party intended "plans available" to mean that insurance benefits were to be offered to the plaintiffs on the same terms as those available to active employees. The ERIP contract's language was intended to confer an unalterable right to paid premiums on the ERIP participants for the duration specified in the ERIP PBEs. In all other respects, the insurance plans offered to the ERIP participants would be the same as those offered to the active employees.

46

C.     Damages

At trial, the Court received Joint Exhibit 2001, identified as the "Stipulated Exhibit Reflecting Plaintiffs' Out-of-Pocket Costs for Health and Dental Coverage under the Milwaukee Forge Health Plan from November 1, 2001 Through February 29, 2004." Those dollar figures are the stipulated premiums paid by the plaintiffs, except for James and Diana Mantz. The Mantzes refused to pay the premium when the Company implemented that requirement. The Court, however, did not receive information at trial about the damages that the Mantzes have suffered. While the Plaintiffs' Exhibit 19 contains claimed premium costs for the Mantzes, the Court never received that document into evidence. As such, the Court cannot calculate the Mantzes' damages.

The Court will address the issue of attorney's fees and costs in separate briefing. To that end, this Court's order will contain a date certain by which the plaintiffs may move and brief, or renew any previous request, for attorneys' fees. If the plaintiffs request fees and costs, the briefing of that request will conform to this Court's motion practice as found in its local rules.

## VI.     CONCLUSIONS OF LAW

Based on the foregoing, the Court concludes, as a matter of law that:

The payment of premiums was not a "benefit" under the health plans offered by the Company.

The ERIP contract entered into by the plaintiffs and the Company is an independent contract, supported by separate consideration. The ERIP's language asserting that the Company "will continue to pay the premiums for the group hospital, surgical, and dental insurance for the retirees, their spouses and dependent until each respectively becomes eligible for Medicare," supplanted any reservation of rights contained in the employees' health plans entered into at the time they signed the ERIP and it became effective.

The ERIP contract embodied the parties' intent that the Company would pay, in full, the insurance premiums for the ERIP Participants and their spouses, until each became eligible for Medicare. This guarantee overrode any claimed right to modify the allocation of premium payments based on modification provisions contained in individual health plans.

Based on the evidence presented at trial, the plaintiffs have a guaranteed right to payment of premiums by the Company for their health and dental coverages.

The Company's failure to pay the aforementioned premiums was a violation under ERISA and the ERIP contract.

The Company's failure to pay the promised premiums resulted in the assumption of costs by the plaintiffs that should have been paid by the Company pursuant to the ERIP contract. The plaintiffs were damaged in the following amounts:

A. $6,688.76 to Wayne and Gayle Stevenson

B. $4,781.73 to Larry and Judy Holzmiller

C. $6,484.08 to Randall and Margaret Jacobson

48

D. $1,774.18 to Ronald Lonscar

E. $6,484.08 to Stan and Janice Mattson

F. $10,622.76 to Daniel and Margaret Shillinglaw

G. $3,274.36 to Douglas Tetting

H. $5,292.76 to Terrence and Jean Vogl

I. $10,661.08 to Roger and Linda Willms

J. $10,888.76 to Jeffrey and Mary Weide

K. $6,484.08 to Eugene and Eileen Ziarek

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Company **SHALL** pay the following amounts to the identified plaintiffs:

A. $6,688.76 to Wayne and Gayle Stevenson

B. $4,781.73 to Larry and Judy Holzmiller

C. $6,484.08 to Randall and Margaret Jacobson

D. $1,774.18 to Ronald Lonscar

E. $6,484.08 to Stan and Janice Mattson

F. $10,622.76 to Daniel and Margaret Shillinglaw

G. $3,274.36 to Douglas Tetting

H. $5,292.76 to Terrence and Jean Vogl

I. $10,661.08 to Roger and Linda Willms

49

J. $10,888.76 to Jeffrey and Mary Weide

K. $6,484.08 to Eugene and Eileen Ziarek

Milwaukee Forge and Milwaukee Forge Health Plan are hereby **ENJOINED** and barred from requiring the plaintiffs to pay any portion of the premiums for the group hospital, surgical, and dental insurance sponsored by the defendants for the plaintiffs, and Milwaukee Forge is required to continue to pay the entirety of the premium payments for the group hospital, surgical, and dental insurance sponsored by the defendants for the plaintiffs until each plaintiff becomes eligible for Medicare.

The Clerk of Court **SHALL** enter judgment accordingly.

The plaintiff **SHALL** submit any briefing requesting attorney's fees and costs no later than September 18, 2006.

Dated at Milwaukee, Wisconsin this 17th day of August, 2006.

**BY THE COURT**


s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**

50